Jeffrey S. Beelaert (Idaho Bar No. 12384)
GIVENS PURSLEY LLP
601 West Bannock Street
P.O. Box 2720
Boise, Idaho 83701-2720
Phone: (208) 388-1218
Fax: (208) 388-1300
jbeelaert@givenspursley.com

*Attorneys for Allegiance Behavioral Health LLC*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ALLEGIANCE BEHAVIORAL HEALTH LLC,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>STATE OF IDAHO, and STATE OF IDAHO DEPARTMENT OF HEALTH AND WELFARE,<br><br>　　　　Defendants. | Case No. 25-453<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES** |

Allegiance Behavioral Health LLC brings this action against the State of Idaho and against the Idaho Department of Health and Welfare for declaratory and injunctive relief, and for damages. In support of its claims, Allegiance alleges:

### Introduction

1. In January 2025, the Idaho Department of Health and Welfare suspended Medicaid payments to Allegiance Behavioral Health under 42 C.F.R. § 455.23(a) because of what the Department claimed to be "a credible allegation of fraud." Allegiance contests the credibility of that allegation, and it contests the procedures afforded to it thus far in doing so.

COMPLAINT - 1

2.     Allegiance appealed the Department's suspension, and the Idaho Office of Administrative Hearings reviewed the Department's action. An administrative law judge affirmed the Department's suspension of Medicaid payments to Allegiance. Yet the ALJ conducted an unconstitutional administrative hearing that deprived Allegiance of its procedural due process rights. The Department redacted several documents in the administrative record, which were used as government exhibits against Allegiance at the hearing. In allowing the challenged redactions to stand, the administrative law judge prevented Allegiance from confronting and cross-examining adverse witnesses, and the ALJ deprived Allegiance of its opportunity to show that the Department's allegations were not credible. Allegiance respectfully requests that this Court enter judgment in its favor, declaring that the defendants violated its Fourteenth Amendment rights, and enjoining the defendants from continuing to do so on remand. The Court should award damages and attorney's fees to Allegiance.

3.     Under the Idaho Administrative Procedure Act, this Court also may review the administrative law judge's decision. The decision should be set aside.

### Jurisdiction and venue

4.     This action arises under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983. The Court has jurisdiction over Allegiance's claims under 28 U.S.C. § 1331 (federal question jurisdiction), and 28 U.S.C. § 1367(a), which provides for "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

5.     There now exists between the parties an actual, justiciable controversy within the meaning of the Declaratory Judgment Act. In this civil action, the Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

6. "Further necessary or proper relief," including injunctive relief, also may be granted by this Court "against any adverse party whose rights have been determined" in a declaratory judgment.  28 U.S.C. § 2202.

7. Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1) because Allegiance Behavioral Health is a limited liability company registered in Idaho, and a substantial part of the events or omissions giving rise to the Allegiance's claims occurred in this district.

## Parties

8. Plaintiff Allegiance Behavioral Health is an active limited liability company registered with the Idaho Secretary of State.  Allegiance provides behavioral health services to Idaho residents under the "State plan" for medical assistance covered by Medicaid, a joint federal and state program that helps cover medical costs for people with limited income and resources.  42 U.S.C. § 1396a(a).

9. Defendant State of Idaho achieved statehood in 1890.

10. Defendant Idaho Department of Health and Welfare is an executive department of the State of Idaho.  The Department leads a collaborative behavioral healthcare system in Idaho that provides behavioral health treatment and services to Idaho residents.  Magellan Healthcare currently is the managed care organization for the Idaho Behavioral Health Plan, which provides behavioral health services to Medicaid members and other eligible Idaho residents.

## Legal background

11. The Due Process Clause of the Fourteenth Amendment prohibits states from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

12. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319 (1976).  Due process "is flexible and calls for such procedural protections as

the particular situation demands." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

13. "The opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard." *Goldberg v. Kelly*, 397 U.S. 254, 268–69, (1970). "In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Id.* at 269.

14. "Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." *Cary v. Piphus*, 435 U.S. 247, 259 (1978).

14. Certain due process principles have remained relatively immutable in the Supreme Court's jurisprudence. "One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." *Greene v. McElroy*, 360 U.S. 474, 496 (1959).

15. Courts zealously must guard these protections "not only in criminal cases, but also in all types of cases where administrative and regulatory actions were under scrutiny." *Id.* at 497 (citations omitted). "For more than a century the central meaning of procedural due process has been clear"—parties whose rights are affected are entitled to be heard. *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972).

16. "The requirement of procedural due process imposes constraints on government actions which deprive individuals of protected liberty and property interests." *Powderly v. Schweiker*, 704 F.2d 1092, 1097 (9th Cir. 1983). To state a cognizable due process claim, a plaintiff must have a "recognized liberty or property interest at stake." *Schroeder v. McDonald*, 55 F.3d 454, 462 (9th Cir. 1995).

17. Plaintiffs, however, "do not possess a property interest in continued participation in Medicare, Medicaid, or the federally-funded state health care programs." *Erickson v. U.S. ex rel. Dep't of Health & Hum. Servs.*, 67 F.3d 858, 862 (9th Cir. 1995).

18. Even so, a "liberty interest is implicated if a charge impairs [the plaintiff's] reputation for honesty or morality." *Id.* "The procedural protections of due process apply if the accuracy of the charge is contested, there is some public disclosure of the charge, and it is made in connection with the termination of employment or the alteration of some right or status recognized by state law." *Vanelli v. Reynolds Sch. Dist. No. 7*, 667 F.2d 773, 778 (9th Cir. 1982).

19. Liberty guaranteed by the Fourteenth Amendment is necessarily broad. *See Bd. of Regents v. Roth*, 408 U.S. 564, 572 (1972).

20. "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

21. Section 1983 "is not itself a source of substantive rights," but instead provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U. S. 137, 144, n.3 (1979).

22. "In this Circuit, nominal damages must be awarded if a plaintiff proves a violation of [its] constitutional rights." *George v. City of Long Beach*, 973 F.2d 706, 708 (9th Cir. 1992). A plaintiff also may be entitled to "compensable damages for a section 1983 violation." *Vanelli*, 667 F.2d at 781.

23. A state Medicaid agency, such as the Idaho Department of Health and Welfare, "must suspend all Medicaid payments to a provider after the agency

determines there is a credible allegation of fraud for which an investigation is pending under the Medicaid program against an individual or entity unless the agency has good cause to not suspend payments or to suspend payment only in part." 42 C.F.R. § 455.23(a)(1).

24.     "The Idaho Administrative Procedure Act (IDAPA) governs the review of local administrative decisions," *Urrutia v. Blaine Cnty.*, 134 Idaho 353, 357, 2 P.3d 738, 742 (2000), including decisions made by the Idaho Department of Health and Welfare to suspend Medicaid payments to providers.

25.     As a fundamental principle of administrative law, "the focal point" for the review of an agency's action "should be the administrative record already in existence." *Regan v. Kootenai County*, 140 Idaho 721, 725, 100 P.3d 615, 619 (2004) (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)); *see also* Idaho Code § 67-5277.

26.     The administrative record for an agency decision consists of "*any* agency documents expressing the agency action when the agency action was neither an order nor a rule." *Petersen v. Franklin County*, 130 Idaho 176, 185, 938 P.2d 1214, 1223 (1997) (quoting Idaho Code § 67–5275(1)(c)) (emphasis added).  The word "any" has "an expansive meaning." *Abbott v. United States*, 562 U.S. 8, 28 (2010) (internal quotation marks omitted).

## Factual and procedural background

27.     The Department of Health and Welfare suspended Medicaid payments to Allegiance in January 2025 based solely on a referral that it received from the State's contractor—Magellan Health.

28.     In the payment suspension letter issued to Allegiance, the Department referred to what it considered to be a "credible allegation of fraud for which an investigation is pending under the Medicaid program."  But the Department never determined the credibility of the allegations that Magellan referred.

COMPLAINT - 6

29. Magellan cannot suspend payments to behavioral health providers—only the State may do so after the Department reviews the allegations and determines them to be credible. Yet that did not occur here. Allegiance challenged the suspension by filing an appeal before the Idaho Office of Administrative Hearings.

30. Procedurally, Allegiance argued that the Department failed to comply with the notice requirements under 42 C.F.R. § 455.23(b)(1)(i). The Department did not send notice to Allegiance within *five days* of suspending payments. As to the actual suspension date, the Department shifted the date while administrative proceedings were underway before an administrative law judge.

31. Allegiance maintains records for each patient that it treats, including "progress notes" that document the services that it provides. As one witness testified on behalf of Allegiance, progress notes document "all the information down to the billing codes, and how long or the amount of units that were used," and they document "who the provider was"—i.e., "who actually completed the service to the client."

32. Allegiance also maintains a Comprehensive Diagnostic Assessment (referred to as a CDA) for each behavioral health patient as required by Medicaid for services. The CDA is a mental health evaluation used to diagnose mental health disorders and to inform treatment planning, and the CDA documents who is responsible for an individual patient's diagnosis.

33. In addition to the CDA, Allegiance maintains intake forms for each patient; these forms document the patient's background and history, along with other personal information such as the patient's identification and Medicaid card used for billing. Allegiance requires each patient to update those forms every time the patient visits its office, and the client signs the documents along with a witness at the office.

34. At any time, the Department of Health and Welfare—as well as its contractor, Magellan—may request patient treatment records from Allegiance.

COMPLAINT - 7

35. All service providers "providing services under the State plan" for Medicaid must agree "to keep such records as are necessary fully to disclose the extent of the services provided to individuals receiving assistance under the State plan," and all service providers must agree "to furnish the State agency or the Secretary with such information, regarding any payments claimed by such person or institution for providing services under the State plan, as the State agency or the Secretary may from time to time request." 42 U.S.C. § 1396a(a)(27).

36. The Medicaid Program Integrity Unit—a component of the Department of Health and Welfare—maintains a policy and procedures manual, and the manual includes a form used to request documents and records from providers. The first line of the request form states: "Pursuant to State and Federal Regulations, the Medicaid Program periodically conducts reviews to verify that billed services were rendered and adequate documentation is recorded in the medicals records." And the form continues to explain, with fill-in-the-black options, that the Department may state that it is "currently reviewing" specific "services provided from DATE to DATE for" specific clients.

37. Allegiance primarily provides behavioral health services to refugee communities in Idaho. Refugees often arrive in the United States without any knowledge of life in America—they need help with housing, with grocery shopping, and with navigating the various services potentially available to them.

38. When providing services to clients, Allegiance often relies on interpreters. And whenever an Allegiance employee provides services to a client, the employee documents those services by creating records (such as progress notes). If an interpreter is present while the services are being provided, that information is documented in the progress notes as well as in billing records.

39. On January 14, 2025, Magellan's Executive Director for the Idaho Behavioral Health Plan sent an email to Allegiance with the subject line, "Provider

Suspension Notice." The Executive Director explained in his email that he had "talked with the department," and that he had been "asked" to send "a copy of the notice." As an attachment to the email, the Executive Director included a letter from the Department of Health and Welfare. The letter stated that the Department, "through its contractor Magellan, is hereby suspending all Medicaid payments to Allegiance Behavioral Health" under 42 C.F.R. § 455.23.

40. The letter attached to the email was dated January 10, 2025, and it included a tracking number for certified mail (# 7016 1370 0000 2343 7398). The certified mail tracking number confirmed that the letter was routed to Washington State and that it did not arrive in Boise until January 16, 2025.

41. When issuing a notice of suspension, the State of Idaho, acting through the Department of Health and Welfare, "must send notice of its suspension of program payments" within *five days* "of taking such action unless requested in writing by a law enforcement agency to temporarily withhold such notice." 42 C.F.R. § 455.23(b)(1)(i). But the Department did not comply with the five-day notice requirement.

42. On January 14, 2025, Allegiance first learned of the payment suspension from Magellan—not from the Department. In reviewing billing records, Allegiance learned that the Department had suspended payments sometime around or shortly after January 3, 2025—the last day that Allegiance received a Medicaid payment.

43. The date on the letter (January 10, 2025) as well as the date-stamped electronic signature confirmed that the letter was not sent to Allegiance within five days of January 3, 2025, when the Department last made a Medicaid payment.

44. Either way, the Department later "retracted" the validity of the first letter without giving Allegiance any meaningful explanation as to why it did so at that time.

45. The Department issued a second suspension letter dated January 16, 2025, and that letter also included a tracking number for certified mail (# 7016 1370 0000 2343 4267). Using that tracking number, Allegiance learned that the letter was sent via U.S. Postal Service on January 17, 2025, and it was delivered to Allegiance on January 21, 2025.

46. Again, though, to comply with 42 C.F.R. § 455.23(b)(1)(i), the Department had to send notice of the suspension to Allegiance within five days of suspending payments. The Department did not do so because the tracking information confirms that the letter was sent on January 17, 2025.

47. The Deputy Administrator for the Division of Medicaid at the Department of Health and Welfare testified that the Department later "pushed back" the payment suspension date to January 10, 2025, but even that date did not hold. The Department later reset the effective payment suspension date to January 11, 2025.

48. In the payment suspension letter issued to Allegiance, the Department referred to what it considered to be a "credible allegation of fraud for which an investigation is pending under the Medicaid program."

49. Under 42 C.F.R. § 455.2 (cited by the Department in its letter), the term "fraud" refers to "an intentional deception or misrepresentation made by a person with the knowledge that the deception could result in some unauthorized benefit to himself or some other person. It includes any act that constitutes fraud under applicable Federal or State law."

50. And the term "credible allegation of fraud" may include "an allegation, which has been *verified by the State*, from any source, including but not limited to" fraud hotline tips, claims data mining, and patterns "identified through provider audits, civil false claims cases, and law enforcement investigations." 42 C.F.R. § 455.2 (emphasis added).

51. The plain terms of the letter refer to Magellan's referral of what the contractor determined to be a credible allegation of fraud. "Through its contractor, Magellan," the Department stated that it had "determined there is a credible allegation of fraud that Allegiance Behavioral Health billed for services not provided, and an active investigation is pending."

52. On October 18, 2024, Magellan submitted a referral report to the Department in which Magellan concluded that it had established a credible allegation of fraud against Allegiance. During the administrative proceedings, Allegiance was provided only a *redacted* copy of the report without any attachments.

53. Allegiance challenged not only the redactions found in the referral report but also redactions made by the Department in other documents.

54. Allegiance argued that the administrative record must include "any agency documents expressing the agency action when the agency action was neither an order nor a rule." *Petersen*, 130 Idaho at 185, 938 P.2d at 1223 (quoting Idaho Code § 67–5275(1)(c)). And Allegiance argued that the administrative law judge must ensure "that there is a full disclosure of all relevant facts and issues." Idaho Code § 67-5242(3)(a).

55. "At the hearing," Allegiance argued that it has the right "to respond" to the Department's actions, and it has the right to "present evidence and argument on *all issues involved*." Idaho Code § 67-5242(3)(b) (emphasis added).

56. As a bare minimum, Allegiance argued that any administrative hearing must satisfy the "rudimentary" requirements of due process. *Goldberg*, 397 U.S. at 267. That includes the opportunity be heard. *See id.* Allegiance argued that the Department must provide Allegiance "timely and adequate notice detailing the reasons for" its decision to suspend Medicaid payments, and that the Office of Administrative Hearings must provide Allegiance the "effective opportunity to

COMPLAINT - 11

defend" itself at the hearing "by confronting any adverse witnesses and by presenting [its] own arguments and evidence." *Id.* at 267–68; *see also* Idaho Code § 67-5242.

57. The Department opposed Allegiance, and the administrative law judge issued an order against Allegiance.

58. According to the administrative law judge, Allegiance "requested that the ALJ order the Department to produce certain documents, or to re-produce certain documents in an unredacted, or less redacted form." Order at 1. The administrative law judge found Allegiance's arguments "inconsistent with IDAPA 16.05.03.120 (Arch. 2023) and IDAPA 62.01.01." *Id.* at 2. The Department provided redacted copies of the documents that it intended "to offer as exhibits and a list of the witnesses" that it intended to call at the hearing, and the ALJ refused to order the Department to produce unredacted documents.

59. The administrative law judge stated that he "presumptively utilizes IDAPA 16.05.03 (Arch. 2023) in contested cases before the Idaho Department of Health and Welfare, alongside elements of IDAPA 62.01.01, that do not otherwise conflict with IDAPA 16.05.03 (Arch. 2023)." Order at 3.

60. And the administrative law judge concluded that Allegiance's "request for production of documents and/or supplementation of the documents with additional information being unredacted falls outside what the Department intend[ed] to offer as exhibits." *Id.* (applying IDAPA 16.05.03.120 (Arch. 2023)).

61. The administrative law judge added: "This appeal concerns the Department's suspension of Medicaid payments based on the determination of the existence of a credible allegation of fraud." Order at 5. "While acknowledging that there are discrete subparts asserted by [Allegiance] as it relates to this dispute, the scope of this case is indeed limited." *Id.*

62. Had the administrative law judge required the Department to remove the redactions, he stated that that would have required "the Department, and/or their

COMPLAINT - 12

third-party contractors, to spend an onerous amount of staff time to review and make required redactions, and would be unduly burdensome and expensive." Order at 6. The administrative law judge found Allegiance's requests to be "antithetical to the Idaho Rule of Administrative Procedures," which mandate that "the rules in this chapter will be liberally construed to secure just, speedy and inexpensive determination of contested case proceedings." *Id.* (internal quotation marks omitted).

63. The administrative law judge recognized that Allegiance had raised a procedural due process argument that it was "being deprived of a meaningful opportunity to challenge the government action, pursuant to the due process standards in administrative hearings." Order at 7 (citing *Goldberg v. Kelly*, 397 U.S. 254 (1970)). And, according to the ALJ, the "relevant inquiry for procedural due process is whether the procedures employed are fair." Order at 8.

64. The ALJ then found "that the procedures laid out in IDAPA 16.05.03 and 62.01.01 do provide for a fair hearing process," and that Allegiance had overstated "the due process requirements involved in administrative appeal hearings conducted pursuant to IDAPA 16.05.03 (Arch. 2023)." *Id.*

65. According to the ALJ, Allegiance seemed "to argue that to have a meaningful opportunity to confront and cross-examine adverse witnesses" it would require the Department to "produce all documents [Allegiance] seeks in an unredacted, or less redacted manner." *Id.* "The ALJ does not agree." *Id.*

66. At the hearing, Allegiance renewed its objection to the ALJ's previous ruling regarding the redactions, but the ALJ rejected those arguments.

67. Importantly, the Department submitted the referral report from Magellan as Exhibit 16, but it was heavily redacted. Allegiance argued that had no way of establishing whether the allegations of fraud were untrue as it could not see behind the black-box redactions. Again, however, the ALJ disagreed.

COMPLAINT - 13

68. Because Allegiance had provided services to some patients using what Magellan considered to be generalized diagnosis codes—e.g., a generalized anxiety disorder or a post-traumatic stress disorder—Magellan found in its report that there was "a very high likelihood that Allegiance's claims were not valid."

69. But Allegiance argued that context matters: these codes are assigned by clinicians after a Comprehensive Diagnostic Assessment. Allegiance had no way of offering evidence—including Comprehensive Diagnostic Assessments for individual patients—because it had no way of knowing which patients Magellan (and the Department) deemed to be problematic. The Department redacted that information.

70. To the extent that Magellan investigators might have considered different codes assigned by different clinicians working for different behavioral health providers to be "red flags," Allegiance argued that the investigators could have reviewed progress notes and CDA's maintained by Allegiance for each individual patient to determine how patients were diagnosed. Yet Magellan did not do that—investigators admitted that they were not familiar with Allegiance's records system, and they admitted that they did not review *any* records maintained by Allegiance.

71. Magellan's determination as to the credible allegation of fraud was based largely on aggregate billing analysis conducted by its investigators across several high-frequency service codes used by Allegiance. While Magellan's report identified billing overlaps and alleged inconsistencies in diagnostic codes, Magellan did not correlate specific claims with direct evidence of services not rendered or link them to individual misconduct by Allegiance staff. Allegiance was not contacted or given an opportunity to respond before the report was finalized.

72. In discussing records—such as progress notes and intake forms maintained by Allegiance—the Department testified that it did not consider those

COMPLAINT - 14

documents relevant in proving or disproving whether an individual patient actually received services from Allegiance.

73. Ultimately, after several days of hearings, the ALJ affirmed the Department's decision to suspend Medicaid payments to Allegiance.

74. The ALJ first issued a preliminary decision, explaining that it "will become a Final Order without further action of the Department, and without further notice to the parties, unless a party files a Petition for Agency Review." Decision at 43 (citing IDAPA 16.05.03.150 (Arch. 2023).

75. Neither party filed a Petition for Agency Review within fourteen days of the decision.

76. "On the fifteenth day (after the deadline has passed for seeking Agency Review)," the ALJ explained that his "Preliminary Order will become a Final Order without further notice." Decision at 44.

77. "From the date a Preliminary Order becomes a Final Order," the ALJ explained that "a Petition for Judicial Review may be filed in district court within twenty-eight (28) days under Idaho Code section 67-5273(2), Idaho Code, and must comply with Idaho Code sections 67-5270 through 67-5279." *Id.*

78. Instead of filing a petition for judicial review in Idaho state court, Allegiance has filed this action within twenty-eight days of the date that the ALJ's decision became final.

### Causes of Action

**Count I: Violation of the Due Process Clause, 42 U.S.C. § 1983**

79. Allegiance incorporates by reference the above paragraphs (¶¶ 1–78) as though set forth here.

80. To assert a Section 1983 claim, a plaintiff must allege two essential elements: (1) that the defendant acted under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia;

COMPLAINT - 15

and (2) that the defendant's actions deprived the plaintiff of a right secured by the Constitution or federal law.

81. In this case, the Idaho Department of Health and Welfare redacted several exhibits used in the administrative hearing. The Department did so relying primarily on IDAPA 16.05.03.120 (Arch. 2023).

82. The Due Process Clause of the Fourteenth Amendment prohibits states from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

83. Defendants violated Allegiance's procedural due process rights because the redactions deprived Allegiance of the opportunity to confront and cross-examine adverse witnesses. The redactions also deprived Allegiance of the opportunity to show that the evidence used to prove the Department's was untrue.

84. In cases such as this one, "where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case *must be disclosed* to the individual so that he has an opportunity to show that it is untrue." *Greene*, 360 U.S. at 496 (emphasis added). But that did not happen.

85. The Medicaid payment suspension issued by the Idaho Department of Health and Welfare implicates Allegiance's liberty interest because it impairs the company's "reputation for honesty or morality." *Erickson*, 67 F.3d at 862; *see also Cox v. Roskelley*, 359 F.3d 1105, 1113 (9th Cir. 2004) (concluding that a termination letter which alleged that a plaintiff had overcharged for services rendered could impair the plaintiff's "reputation for honesty or morality").

86. Since January 2025, Allegiance has contested—and continues to contest—the accuracy of the charges brought by the Idaho Department of Health and Welfare.

87. Moreover, "there is some public disclosure of the charge." *Vanelli*, 667 F.2d at 778. The Idaho Department of Health and Welfare must report Medicaid payment suspensions to the Healthcare Integrity and Protection Data Bank maintained by the United States Department of Health & Human Services.

88. "Federal and State Government agencies *must* report health care providers, suppliers, or practitioners excluded from participating in Federal or State health care programs" for inclusion in the Healthcare Integrity and Protection Data Bank. 45 C.F.R. § 61.10(a) (emphasis added). The term "exclusion" is defined for reporting purposes as "a *temporary* or permanent debarment of an individual or entity from participation in any Federal or State health-related program." *Id.* § 61.3. And, any report of a temporary or permanent suspension submitted to the Healthcare Integrity and Protection Data Bank must include, among other things, "[a] narrative description of the acts . . . upon which the reported action was based." *Id.* § 61.10(b)(4)(i).

89. The Healthcare Integrity and Protection Data Bank is a public database, maintained by HHS under authority provided by the Social Security Act, which records certain "adverse actions" taken against health care providers. *See* 42 U.S.C. § 1320a–7e(a). Information in this database is available on request to federal and state government agencies, health plans, health care practitioners and providers, and persons requesting statistical information. *See* 45 C.F.R. § 61.12(a).

90. Allegiance has suffered damages, and it is entitled to nominal and compensatory damages for the violation of its constitutional rights.

**Count II: Judicial Review of the ALJ's decision**

91. Allegiance incorporates by reference the above paragraphs (¶¶ 1–78) as though set forth here.

92. Judicial review of the administrative law judge's final decision affirming the suspension of Medicaid payments to Allegiance is available under the Idaho Administrative Procedure Act.

92. This Court "shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." Idaho Code § 67-5279(1).

93. This Court shall affirm the agency action unless the court finds that the action was:

(a) In violation of constitutional or statutory provisions;

(b) In excess of the statutory authority of the agency;

(c) Made upon unlawful procedure; or

(d) Arbitrary, capricious, or an abuse of discretion.

*Id.* § 67-5279(2).

94. "If the agency action is not affirmed, it shall be set aside, in whole or in part, and remanded for further proceedings as necessary." *Id.*

95. Here, the ALJ's decision cannot be affirmed under Idaho Code Section 67-5279(2). For several reasons, and as explained in detail above, the ALJ failed to ensure that there was "a full disclosure of all relevant facts and issues." Idaho Code § 67-5242(3)(a). The ALJ erroneously rejected Allegiance's procedural due process arguments regarding the Department's redactions, and the ALJ issued a decision that is arbitrary and capricious.

96. This Court must set aside the ALJ's decision.

## Prayer for Relief

WHEREFORE, Plaintiff Allegiance respectfully prays for judgment:

(a) Declaring that the Idaho Department of Health and Welfare violated Allegiance's due process rights under the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983;

(b) Declaring that the Administrative Law Judge's decision affirming the Department's suspension of Medicaid payments to Allegiance is unlawful as a violation of constitutional or statutory provisions; in excess of the statutory authority of the agency; made upon unlawful procedure; or arbitrary, capricious, or an abuse of discretion under the Idaho Administrative Procedure Act.

(c) Vacating the Administrative Law Judge's decision affirming the Department's suspension of Medicaid payments to Allegiance;

(d) Granting injunctive relief enjoining the Department from engaging in unlawful actions on remand;

(e) Awarding Allegiance nominal damages;

(f) Awarding Allegiance compensatory damages;

(g) Awarding Allegiance attorney's fees; and

(h) Granting any additional relief as may be just and proper.

Respectfully submitted,

GIVENS PURSLEY LLP

*/s/ Jeffrey S. Beelaert*
Jeffrey S. Beelaert

*Attorneys for Allegiance Behavioral Health*

August 12, 2025